United States Court of Appeals,

Fifth Circuit.

No. 92-1782

Summary Calendar.

AMERICOM DISTRIBUTING CORPORATION, Plaintiff-Appellant,

v.

ACS COMMUNICATIONS, INC., et al., Defendants.

ACS Communications, Inc., Defendant-Appellee.

May 6, 1993.

Appeal from the United States District Court for the Northern District of Texas.

Before REYNALDO G. GARZA, DUHÉ and EMILIO M. GARZA, Circuit Judges.

REYNALDO G. GARZA, Circuit Judge:

The appellant, Americom Distributing Corporation ("Americom"), appeals the district court's judgment that they take nothing as to their antitrust and deceptive trade claims against ACS Communications, Inc. ("ACS"). Upon review, we also find that Americom's contentions are meritless and we therefore affirm.

*FACTS*

Appellant Americom and ACS entered into a non-exclusive distributorship agreement. The agreement provided a limited line of credit to Americom as a new distributor for ACS's products. 80% of Americom's business was the distribution of modified ACS headsets to the United States Automobile Association ("USAA"). Americom provided a $5,000 letter of credit and later a $10,000 letter of credit. The agreement allowed for the suspension of shipments if payments were to become overdue.

Due to the appellant's credit history, a special method of payment was implemented. Payments on invoices were sent directly by customers to the Rio Vista Bank. The bank would pay ACS and then forward the balance to Americom. By March and April, 1986, $30,000 to $40,000 had become overdue. Some of the bills were unpaid for as much as 90 days. At this time, ACS

learned that their special payment arrangement had been canceled by Americom without ACS's knowledge. Americom told ACS that they would be obtaining assistance with their financing from a new company. ACS's repeated requests for financial information on this new company were not responded to until May, 1986. ACS's Regional Sales Manager, Skip Hill, had also heard of complaints by Americom's employees regarding their late compensation and the ongoing reorganization.

ACS had serious doubts about Americom's ability to meets its obligations because of the secret termination of their banking arrangement, the increasingly overdue bills, the scarcity of information about the new source of financing, and the apparent dissension amongst some of Americom's staff. ACS was particularly concerned because the customer, USAA, had requested that their orders for specially modified headsets not be delayed.

On April 28, 1986, ACS wrote a letter to Clyde Nivens, the President of Americom, suspending their account until further notice. ACS did not want to continue extending credit to Americom because of its payment history and their ongoing financial transition. ACS also informed USAA of the suspension because this customer wanted to be notified of any delay in shipments.

Sometime prior to the suspension, a former employee of Americom, Joe Ashmore, and another businessman, Gary Belcher, approached ACS regarding a distributorship. Phil Gattey, Executive Vice President of ACS, stated that he would have to first see the new company's financial information and sales projections. ACS started supplying headsets to First Comm.

In early June, ACS granted a distributorship to the new company based on its satisfactory financial information and superior sales projections. At this time ACS lifted the suspension of Americom and resumed shipping headsets but the cost per unit was $6.17 more than was charged First Comm. ACS claimed that the difference was due to First Comm's expected larger orders in the future and, therefore, ACS's lower cost per unit to ship. Americom's payments again became overdue and their distributorship was finally canceled in December, 1986.

The parties went to arbitration and it was found that Americom should take nothing against ACS, except for about $7,000 due to the fact that ACS did not ship 200 headsets to Americom that

had been agreed to before the suspension. Americom brought suit in federal district court. The court conducted a non-jury trial for the causes of action alleged under the Sherman and Clayton Acts and Texas Deceptive Trade Practices. The court found that Americom's claims lacked merit and that they should not recover anything. Americom filed an appeal on September 9, 1992.

*ANALYSIS*

I. *Sherman Act Claim*

The appellant claims that ACS's granting of a distributorship to First Comm and the eventual termination of Americom as a distributor constituted an unfair restraint of trade in violation of the Sherman Act.[1] Americom also argues that the refusal to ship headsets to Americom during its suspension while ACS was using First Comm, unfairly hindered competition. The appellant's argument fails because there is no evidence of any concerted effort or conspiracy to damage Americom's business. "Independent action is not proscribed. A manufacturer of course generally has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775, 783 (1984). Americom was suspended and later terminated solely because of its poor payment habits. The evidence shows that Americom unilaterally dissolved the banking arrangement that ACS had agreed to. The appellant's credit was so weak that it had to turn to another company for financing. A restraint of trade has to be unreasonable for it to violate the Sherman Act. *Northwest Stationers v. Pacific Stationery,* 472 U.S. 284, 289, 105 S.Ct. 2613, 2616, 86 L.Ed.2d 202, 208 (1985). The suspension and subsequent termination of Americom was sound business policy and was not

---

[1]The relevant provisions of the Sherman Act state:

> Sec. 1. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal....

....

> Sec. 2. Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony....

unreasonable. The dealing with First Comm was a rational, proper and independent choice. The fact that Americom was allowed to continue working for six months after its suspension, underscores ACS's reasonableness.

The evidence supports the findings of fact by the district court that the suspension and termination of Americom were independent decisions taken by ACS based on sound fiscal policy. The appellant was not terminated because it was price cutting or to limit the competition in favor of the new distributor, First Comm. The termination of a distributor that consistently paid its bills late was not anti-competitive. To continue to allow an entity to pay their invoices at their leisure while rival distributors were held to a much stricter time frame would have put a restraint on fair competition.

Americom has failed to prove that there was any collusion or anti-competitive motives to ACS's actions. No horizontal conspiracy between competitors or even a vertical agreement between manufacturer and distributor is found here. There is also no demonstration of any price-fixing attempts by ASC or any unreasonable refusal to deal with Americom. There is no valid Sherman Act Claim here. *See Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d 1245, 1246-49 (5th Cir.1975).

II. *Clayton Act Claim*

The appellant contends that the $6.12 discount provided to First Comm and not to them constitutes a violation of the Clayton Act.[2] As already discussed, no conspiracy of any sort was

---

[2]The relevant provision of the Clayton Act states:

> Sec. 2. (a) It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them: *Provided,* That nothing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered....

proven. A valid Clayton Act claim requires evidence of a predatory price conspiracy. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 595, 106 S.Ct. 1348, 1360, 89 L.Ed.2d 538, 558 (1986). The Act allows a price differential due to savings in costs of manufacture, delivery, or sale. *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 555-56, 110 S.Ct. 2535, 2542-43, 110 L.Ed.2d 492, 511 (1990).

A violation involves the predatory price setting while foregoing revenues in order to hamper competition or monopolize the market. *Stitt Spark Plug Co. v. Champion Spark Plug Co.,* 840 F.2d 1253, 1256-57 (5th Cir.1988). The record indicates that First Comm was given a discount because of its larger forecast of orders for the headset, which included orders for other companies other than just USAA, Americom's only customer for the headset. ACS was impressed with First Comm's credit information and felt that the larger forecast of orders would be fulfilled by the new company. The small price differential was justified by the evidence and this did not cause Americom to go out of business. The appellant's lack of liquidity was its main problem. There is no valid Clayton Act claim here.

III. *Deceptive Trade Practices Act Claim*

The appellant argues that they were taken advantage of to a grossly unfair degree by unconscionable acts by ACS in violation of the Texas Deceptive Trade Practices Act ("DTPA"). There are two requirements to be considered a consumer with standing to sue under the DTPA. First the claimant must have purchased goods or services, and secondly, the goods must form the basis of the complaint. *Cameron v. Terrell & Garrett,* 618 S.W.2d 535, 539 (Tex.1981). The appellants had indeed purchased goods but their complaint is based on the suspension of the distributorship and not with any fault in the goods. The cause of action does not properly come under the DTPA.

As mentioned earlier, Americom suffered due to its own lack of liquidity. The appellant chose to unilaterally terminate the agreed upon method of payment via the bank. It can only blame itself for its arrears and the need to find new financing through new partners. The new company started by its ex-employee was successful through merit and not a conspiracy with ACS. The appellant was not taken advantage of to any "grossly unfair degree." *Chastain v. Koonce,* 700

S.W.2d 579, 583 (Tex.1985). The suspension and termination were justified. The price differential was proper given the circumstances. The complaint of unfair treatment and deception must be the producing cause of the injury. *Rourke v. Garza,* 530 S.W.2d 794, 801 (Tex.1975). The cause of Americom's losses was the fact that 80% of its business came from one customer, USAA. This account was only sold ACS headsets and Americom was consistently unsuccessful in paying its bills on time to this all important supplier. There is no evidence of any deceptive causing conspiracy. The district court found correctly that the appellant was treated fairly. The DTPA claim is also meritless.

## *CONCLUSION*

The district court was correct in ruling that Americom should take nothing against ACS. The findings of fact in this case should only be disturbed if after review of the entire record we are convinced that a mistake was committed. *Onaway Transp. Co. v. Offshore Tugs, Inc.,* 695 F.2d 197, 200 (5th Cir.1983). We are not and we therefore

AFFIRM.