**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

**No. 99-40181**

**TEXAS MUNICIPAL LEAGUE, ETC., ET AL.,**

**Plaintiffs,**

**CITY OF PASADENA, CITY OF BEAUMONT,**

**Plaintiffs-Appellants-Cross-Appellees,**

**VERSUS**

**HARTFORD LIFE & ACCIDENT INSURANCE COMPANY, HARTFORD FIRE INSURANCE COMPANY,**

**Defendants-Appellees-Cross-Appellants.**

Appeals from the United States District Court
For the Southern District of Texas
(B-91-CV-166)

September 27, 2000

Before KING, Chief Judge, GARWOOD and DeMOSS, Circuit Judges.

PER CURIAM:[*]

This consolidated appeal involves what are essentially two different cases arising out of the Texas Municipal League Benefits Risk Pool's ("TML Risk Pool") insurance and administration

---

[*] Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

contracts with Hartford Life and Accident Insurance Company and Hartford Fire Insurance Company (collectively "Hartford"). In the first case, the City of Pasadena ("Pasadena") appeals the district court's final judgment, following entry of a judgment on partial findings under Federal Rule of Civil Procedure 52(c), providing that Pasadena take nothing for its breach of contract claim and its claims under the Texas Deceptive Trade Practices and Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code Ann. §§ 17.01-17.854, and Texas Insurance Code article 21.21 § 16(a). Hartford cross-appeals, arguing that the district court erred in not ordering restitution by Pasadena to Hartford for overpayment under their contract.

In the second case, the City of Beaumont ("Beaumont") challenges the district court's denial of attorney's fees despite its finding in favor of Beaumont's breach of contract claim against Hartford. Beaumont further contends that the district court erred in reducing the damages award and in failing to find a violation of article 21.21-2 of the Texas Insurance Code. Hartford cross-appeals, maintaining that the district court improperly concluded that Hartford breached its contract with Beaumont.

## I.  BACKGROUND

In 1979, the TML Risk Pool, an affiliate of the Texas Municipal League, was formed to procure and manage health insurance

for the employees of member-city governmental entities. Pasadena and Beaumont were members of the TML Risk Pool. In 1986, the TML Risk Pool placed its health insurance program out for bid. As a result, Hartford forwarded a proposal ("Proposal") and was ultimately selected as the insurer and claims administrator. After the bid process, Hartford, the TML Risk Pool, and various other interested parties including some member cities negotiated a series of agreements to govern their relationships.

In late September 1991, the TML Risk Pool filed suit against Hartford in Cameron County District Court for damages arising from Hartford's alleged malfeasance or nonfeasance with respect to the health insurance program. Hartford removed the action to federal court on the basis of diversity. Thereafter, Beaumont intervened as an individually-named plaintiff in the TML Risk Pool lawsuit while Pasadena filed a separate suit. In response to Pasadena's action, Hartford filed a counterclaim against Pasadena, seeking to recoup damages for the overpayment of medical claims. Ultimately, Beaumont and the TML Risk Pool's lawsuit was consolidated with Pasadena's suit. That consolidated case proceeded to a bench trial in February 1996. During trial, the TML Risk Pool settled with Hartford, but Pasadena and Beaumont continued with their claims.

A. *Pasadena's Claims Against Hartford*

In 1986, Pasadena hired Hartford to administer Pasadena's self-funded health insurance program and to provide excess

coverage. Pasadena, Hartford, and the TML Risk Pool executed three contracts: 1) an Administrative Services Agreement ("ASO"); 2) an Individual Stop-Loss Contract ("ISL"); and 3) an Aggregate Stop-Loss Contract ("ASL"). Pasadena remained a self-funded entity, but under the ASO, Hartford had to administer the payment of bills received from medical providers. Under the ISL and the ASL, Hartford had to provide excess insurance coverage, which required Hartford to pay the costs of individuals above a certain amount and the aggregate costs of all benefits above a certain amount.

Prior to entering the agreements with Hartford, Pasadena had established a Preferred Provider System ("PPO") in 1984. Under the PPO, medical providers had agreed to certain percentage discounts off their standard charges in exchange for Pasadena's recommending those providers. An outside vendor, CAPPCare,[2] was hired by Pasadena to administer the PPO. Before Hartford began administering Pasadena's health insurance claims, the medical providers had been responsible for submitting already discounted bills. During Hartford's administration of Pasadena's health insurance plan, however, the PPO providers' bills did not include a discount.

Several months after the start of Hartford's tenure, Pasadena's health insurance plan became underfunded, resulting in substantial losses. Believing that the result of the losses were

---

[2] Originally, Pasadena contracted with Southeast Medical Service ("SEMS") to administer the PPO. CAPPCare later purchased SEMS.

4

due to Hartford's failure to apply the PPO discount on the bills submitted by the medical providers, Pasadena filed suit against Hartford. Pasadena's amorphous complaint seemed to raise three claims: 1) under the ASO and Hartford's Proposal, Hartford should have taken the PPO discount from the bills submitted by the medical providers; 2) pursuant to Hartford's administrative responsibilities under the ASO and the Proposal, Hartford should have discovered that the shortfall occurred from the failure to take the PPO, and it should have instituted a program to secure the health insurance plan's financial stability; and 3) in the alternative, the Proposal included representations regarding the services to be provided that ultimately proved untrue, and those representations constituted DTPA and Texas Insurance Code violations. The case went to trial, but after Pasadena presented its case, the district court ruled pursuant to Rule 52(c) that Hartford did not breach its contract with Pasadena because Hartford did not have any knowledge that non-discounted bills would be submitted and because the ASO did not require Hartford to ascertain that fact.[2] Furthermore, the district court held against Hartford in its counterclaim to recoup from Pasadena alleged overpayments made by Hartford due to Pasadena's exceeding its ISL and ASL limits sooner than if discounted PPO payments had been made.

---

[2] Two different judges comprised the district court that heard the TML Risk Pool suit. Judge Reavley entered several pre-trial orders, while Judge Newblatt conducted the trial and entered the final judgments. Both sat by designation.

Both Pasadena and Hartford appeal the district court's rulings.

*B.   Beaumont's Claims Against Hartford*

Hartford's contract with Beaumont ran from October 1, 1986 through September 30, 1989. Beaumont's relationship with Hartford was governed by a Minimum Premium Agreement ("MPP"), which incorporated a delayed funding mechanism, excess insurance coverage, and claims processing by Hartford. Under the MPP, Beaumont funded the health claims of its municipal employees and their eligible dependents (collectively "participants") up to an agreed maximum by reimbursing Hartford for medical claims that Hartford processed and paid. Beaumont funded the claims by remitting payments to Hartford on a delayed basis rather than in advance. The insurance coverage related to Hartford's agreement to cover with its own funds claims that exceeded certain limits. Three limits existed under the MPP. First, the Individual Participant Liability Limit ("IPLL") limited Beaumont's liability for each individual's claims. Second, the Aggregate Plan Liability Limit ("APLL") limited Beaumont's liability for all participants' health claims in a contract year. And third, if Beaumont so chose, the Plan Benefit Extension Limit ("PBEL") could limit Beaumont's liability for health claims after termination of the MPP.

In early 1989, Beaumont decided to become self-insured and to terminate its relationship with Hartford effective September 30,

6

1989. When Beaumont intervened in the TML Risk Pool suit, it asserted various claims ranging from breach of contract to DTPA violations. Of those claims, most were dismissed before trial. The only claim to survive and be addressed by the district court was Beaumont's breach of contract claim under the MPP. In general, that claim concerned the payment of claims in the final year of the contractual relationship, specifically the medical expenses incurred before the termination date but not paid on or before that date. Beaumont contended that Hartford was liable for those claims and, as a result, argued that those claims should have been included in any calculation of the APLL for the final contract year. Because those claims would have added to any excess beyond the APLL limit, Beaumont sought reimbursement of its funds. At trial, the district court agreed with Beaumont and awarded $371,868.41 in damages. After post-trial motions for reconsideration, the district court reduced that amount to $346,421.70, but did not award Beaumont attorneys' fees or treble damages under the Insurance Code. The district court, however, did award Beaumont pre-judgment interest accruing as of October 30, 1989, thirty days after the MPP expired.

Both Beaumont and Hartford appeal.

## II. DISCUSSION

A. *Pasadena v. Hartford*

7

Pasadena presents three main issues on appeal. The first two concern Pasadena's claims against Hartford for overpayment of health insurance claims to medical providers, while the last issue refers to Hartford's cross-appeal against Pasadena for restitution. We review the first two issues apart from the last.

1.   Pasadena's Two Claims Against Hartford

The district court entered the final judgment as to Pasadena's claims after it first granted Hartford's motion for judgment on partial findings under Rule 52(c).[3]   Accordingly, we review the judgment under the standard reserved for a Rule 52(c) ruling.  *See* ***Downey v. Denton County, Tex.***, 119 F.3d 381, 385 (5th Cir. 1997). The factual findings are reviewed for clear error, while the district court's legal conclusions are subject to de novo review. ***Id.*** & n. 5.   The construction of an unambiguous contract is a question of law.[4]  *See* ***Tarrant Distribs. Inc. v. Heublein Inc.***, 127 F.3d 375, 377 (5th Cir. 1997).

---

[3]  Rule 52(c) provides:
If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence.  Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

[4]  Neither Pasadena or Hartford asserts that the ASO is ambiguous.

On appeal, Pasadena asserts that the district court erred in dismissing two of the three claims that were apparently raised in district court.[5]  First, Pasadena re-urges one of the two breach of contract claims, arguing that pursuant to Hartford's administrative responsibilities under the ASO and the Proposal, Hartford should have discovered that the shortfall in the health insurance plan occurred from the failure to take the PPO discounts and, therefore, should have instituted a program to secure the health insurance plan's financial stability.  Second, Pasadena contends, in the alternative, that the Proposal included representations regarding the services to be provided that ultimately proved untrue and that constituted DTPA and Texas Insurance Code violations.

With respect to the breach of contract claim, Pasadena primarily maintains that Hartford breached subsections I(e) and I(f) of the ASO.[6]  Pasadena also asserts that Hartford breached pre-contract statements, in the form of the Proposal, that were

---

[5]  The nature and extent of Pasadena's claims is unclear because of the ambiguous nature of its complaint and briefing.  But it is clear that Pasadena does not appeal the breach of contract claim specifically charging that Hartford had a specific contractual duty to take the PPO discounts.

[6]  Sections I(e) and I(f) provide:
(e) [Hartford] agree[s] to provide actuarial services including (i) annual cost projections, (ii) cost projections for Plan modifications; and (iii) estimates of reserve amounts required to fund the Plan on a current basis.
(f) [Hartford] agree[s] to provide Plan design services including assistance to Plan benefit design based on coverage adequacy, cost control effectiveness, and medical or economic developments.

allegedly integrated into the ASO, but at other times, Pasadena disaffirms any contention that the Proposal was a part of the contract. Whatever is Pasadena's position, we find that the Proposal was not a part of the contract because of the following "merger" clause in the ASO:

> "This Agreement, the Request for Benefit Administration Services, and the attached copy of The Plan, together with any amendments to The Plan, constitute the entire Agreement between [Pasadena] and [Hartford]."

"[I]n the absence of fraud, mistake, or accident, the parol evidence rule is particularly applicable where the written contract contains a recital that the contract encompasses the 'entire agreement between the parties', or a similarly worded merger provision." *Boy Scouts of America v. Responsive Terminal Sys.*, 790 S.W.2d 738, 745 (Tex. App.—Dallas 1990, writ denied) (citations omitted); *see also* *Super-Cold Southwest Co. v. Elkins*, 166 S.W.2d 97, 98 (Tex. 1942). The ASO contains "a similarly worded merger provision." Therefore, we conclude that the pre-contract negotiations did not become part of the contract between Hartford and Pasadena.

As a result, we must look only to subsections I(e) and I(f) of the ASO to determine if Hartford should have discovered that the shortfall in the health insurance plan occurred from the failure to take the PPO discounts and that, therefore, Hartford should have instituted a program to secure the health insurance plan's financial stability. By their plain terms, subsections I(e) and

10

I(f) do not obligate Hartford to discover that the failure to take the PPO discounts might cause the shortfall or to institute some program to secure the health insurance plan's financial stability. Rather, subsection I(e) discusses Hartford's duty to provide actuarial services while subsection I(f) requires Hartford to service the health insurance plan and to provide certain cost control adequacy assistance. Any obligation to account for the PPO discounts so as to ensure a viable health plan does not comport with the actual requirements of the two subsections, nor is there sufficient evidence suggesting that any failure to comply with the plain terms of those subsections lead to Pasadena's damages.[7] Hence, we see no breach by Hartford of subsections I(e) and I(f) of the ASO and find no error on the part of the district court.

Pasadena's second claim on appeal relates to Hartford's pre-contractual representations in the form of the Proposal. Pasadena contends that those representations violated subsections 17.46(b)(5) and (6) of the DTPA[8] and, consequently, article 21.21

---

[7] In essence, Pasadena's claim for breach of subsections I(e) and I(f) is nothing more than another attempt to recoup damages for the failure to take PPO discounts, which the ASO clearly does not require and which formed the basis of the other breach of contract claim that was not appealed to this Court. Therefore, just as the district court's implied finding that Hartford was under no obligation to take the PPO discounts or to ascertain whether it had such an obligation disposed of the non-appealed breach of contract claim, that finding necessarily disposed of Pasadena's claim for breach of subsections I(e) and I(f).

[8] Subsection 17.46(b)(5) makes "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a

11

§ 16(a) of the Texas Insurance Code.[9]  To recover under its DTPA claims, Pasadena must establish that it was a consumer of goods or services, that Hartford violated one of the two "laundry list" provisions Pasadena relies upon, and that the "laundry list" violation(s) was the producing cause of Pasadena's injuries.[10]  *See* ***Americom Distributing v. ACS Comm.***, 990 F.2d 223, 227 (5th Cir. 1993); *see also* Tex. Bus. & Com. Code § 17.50(a).

Again, like Pasadena's other claim on appeal, it is clear that the DTPA action is just another attempt to recoup damages for the failure to take PPO discounts, which the district court found was not a breach by Hartford.  In Pasadena's case, the only damages were essentially the damages resulting from the failure to take the PPO discounts.  There is insufficient evidence of any other damages, and there is no demonstrable link between any DTPA

---

person has a sponsorship, approval, status, affiliation, or connection which he does not" a "false misleading, or deceptive act[] or practice[]."  Similarly, subsection 17.46(b)(7) provides that "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" is also a "false, misleading, or deceptive act[] or practice[]."

[9]  Article 21.21 § 16(a) incorporates the "laundry list" of violations listed in section 17.46 of the DTPA as actionable insurance code violations.  Thus, Pasadena's Insurance Code claim necessarily depends upon its DTPA claim.

[10]  "Producing cause" means "a substantial factor which brings about the injury and without which the injury would not have occurred."  ***Doe v. Boys Clubs of Greater Dallas, Inc.***, 907 S.W.2d 472, 481 (Tex. 1995).  Foreseeability is not required, but cause-in-fact is.  *See* ***id.***  The complained of conduct, however, need not be the sole producing cause.

12

misrepresentations and the losses incurred by Pasadena. Pasadena's losses stemmed from the failure to take PPO discounts, and the district court rightly found no liability on Hartford's part for that failure. Accordingly, we conclude that the district court did not err when it denied any recovery to Pasadena.

2.   Hartford's Restitution Claim

Hartford seeks restitution for the excess funds it paid on the non-discounted bills to the PPO health care providers. Hartford claims that the district court's finding that it did not know of the non-PPO billing compels the conclusion that Pasadena owes Hartford restitution. The district court disagreed, concluding that the errors were attributable to CAPPCare, the PPO administrator, and that no evidence established an agency relationship between Pasadena and CAPPCare. Accordingly, the district court concluded that CAPPCare's errors were not attributable to Pasadena and could not form the basis for an award of restitution.

Under Texas law, "[g]enerally, a party who pays funds under a mistake of fact may recover restitution of those funds if the party to whom payment was made has not materially changed his position in reliance thereon." *Bryan v. Citizens Nat'l Bank*, 628 S.W.2d 761, 763 (Tex. 1982). "The purpose of such restitution is to prevent unconscionable loss to the party paying out the funds and unjust enrichment to the party receiving the payment." *Id.* The excess

13

payments Hartford complains of, although benefitting Pasadena and its employees, were made to the PPO health care providers, who accepted the full bill despite being enrolled in the PPO plan. Hence, those medical providers are the ones who have been enriched by the failure to take the PPO discounts. Unlike the medical providers, Pasadena cannot be said to have been unjustly enriched or to have benefitted from the overpayments.[11] Pasadena itself ultimately paid its full annual deductible under the ASO. Thus, Hartford's restitution claim fails, and we affirm the district court's judgment with respect to that claim.[12]

## B. *Beaumont v. Hartford*

Of the various issues presented in the dispute between Beaumont and Hartford, we first focus on Hartford's claim that the district court misinterpreted the MPP because a ruling favorable to Hartford necessarily disposes of all the issues, except one.[13]

### 1. Whether Hartford Breached the MPP

On cross-appeal, Hartford contends that the district court

---

[11] Hartford states that it paid Pasadena several hundred thousand dollars in compensation, but those dollars constituted reimbursements that were required for having exceeded the ASL and ISL limits and were actually funds repaid to Pasadena for its, not Hartford's, expenditures.

[12] Hartford also seeks attorneys' fees based on a successful restitution claim. The claim for attorneys' fees goes no further than the restitution claim.

[13] The affected issues are Beaumont's claim for attorney's fees, Beaumont's appeal of the reduction of its damages, and Hartford's appeal of the prejudgment interest award. The only non-susceptible issue concerns Beaumont's claim under the Texas Insurance Code.

14

erroneously concluded that Hartford breached the MPP. After trial, the district court entered certain findings regarding the MPP and whether Beaumont or Hartford was responsible for the medical expenses incurred before the termination date, September 30, 1989, but not paid on or before that date. Beaumont had contended that Hartford was liable for those claims and, as a result, argued that those claims should have been included in any calculation of the APLL for the final contract year. Because those claims would have added to any excess beyond the APLL limit, Beaumont sought reimbursement of its funds.

In finding in favor of Beaumont, the district court applied a multi-prong analysis. First, the district court considered section 2[14] of the MPP. Among other things, that section provides that "[i]f an expense is incurred while this Agreement is in effect, but is not paid before the date this Agreement terminates, its disposition shall be determined by the terms of paragraph 3(d) of this Agreement." The district court found, and all parties agreed, the reference to "paragraph 3(d)" was a scrivener's error and was intended to be "paragraph 3(g)."

---

[14] "This agreement shall apply to the claims of participants for the benefits:

  (a) For which such participants are covered under the Group Policy(ies); and
  (b) Which become due while this Agreement is in effect.

If an expense is incurred while this Agreement is in effect, but is not paid before the date this Agreement terminates, its disposition shall be determined by the terms of paragraph 3(d) of this Agreement."

15

As a result, the district court next examined section 3(g). That section states:

> (g) After this Agreement terminates, [Beaumont's] obligation to provide funds for payment of Plan benefits shall cease upon transfer by [Beaumont's] bank to [Hartford's] bank, in accordance with paragraph 7 of this Agreement, Federal Funds sufficient to satisfy benefits paid up to the date of termination. After that, [Hartford] will pay all benefits which are due or become due under the Group Policy(ies). However, [Beaumont] agrees to reimburse [Hartford] for such payments, subject to a maximum reimbursement of the lesser of:
>> (i) The amount of such benefits, plus the administrative costs of their payment; or
>> (ii) <u>The Plan Benefit Extension Limit</u> as shown in the schedule or as amended in accordance with paragraph 10 of this Agreement.
>
> The amount of the <u>Plan Benefit Extension</u> Limit shall be secured to [Hartford] by [Beaumont's] letter of credit or other collateral acceptable to [Hartford]. [Hartford] may call [Beaumont's] letter of credit or other acceptable collateral as may be required to satisfy the preceding conditions of this paragraph 3(g)."

Instead of stopping with this provision to address Beaumont's contractual claim, the district court then proceeded to review section 3(f), which, as the district court also noted, became operative upon termination of the MPP. Section 3(f) reads:

> "(f) After this Agreement terminates, [Beaumont's] obligation to provide funds for the payment of benefits to Participants, as described herein, shall cease with the payment of funds sufficient to satisfy all such benefits paid or payable to Participants up to the date of termination of this Agreement.

After parsing through both sections 3(f) and 3(g), the district court attempted to address Beaumont's allegations regarding those claims that were incurred but not paid by the termination date. The district court interpreted the two sections

16

as covering two different types of "incurred but not paid by the termination date" claims. The district court found section 3(f) as requiring Beaumont to provide funds to satisfy benefits paid or payable up to the date of termination. It further defined the "payable" claims as those claims that had been incurred by the participants and received by Hartford. Concomitantly, the district court ruled that under section 3(f), Hartford must have had the obligation to pay those claims that were paid and to pay those claims that had been incurred by the participants and received by Hartford.[15] As for section 3(g), the district court determined that that section required Beaumont to provide funds sufficient to satisfy claims that had been paid up to the termination date. Moreover, it noted that section 3(g) provided Beaumont with the option to have Hartford "pay all benefits which are due or become due." If Beaumont were to elect that option, then it had to reimburse Hartford the lesser of either the amount of such benefits plus their administrative costs, or the PBEL. The district court surmised that the elective language in section 3(g) referred to the payment of claims that had been incurred by the participants but that had not been received by Hartford before the termination date.

---

[15] In concluding this, the district court questioned whether Hartford could receive monies for benefits payable but not paid during the benefit year. According to the district court, Beaumont clearly had to reimburse Hartford for the benefits that Hartford had paid out. That necessarily implied that if Beaumont were going to reimburse Hartford for benefits that were payable, then Hartford had the obligation to pay those payable benefits.

Accordingly, the district court found that section 3(f) governed claims incurred and due as of September 30, 1989, while section 3(g) dealt with claims incurred but not due on that date. Since Beaumont chose not to have Hartford pay claims under section 3(g), the district court believed that section 3(f) controlled and that, therefore, Hartford had to pay for claims that had been incurred by participants and that had been received by Hartford before the termination date. As the paid claims apparently exceeded the APLL, any obligation on the part of Hartford to pay the payable claims for the 1988-89 contract year amounted to damages for Beaumont.[16]

---

[16] In finding in favor of Beaumont and awarding damages, the district court reconsidered a prior summary judgment ruling, by a different judge sitting as the district court, in which the district court found that under section 3(d), only paid claims were to be considered when calculating the PLL. Section 3(d) provides:
"If, at the end of any Contact Year, the cumulative amount of benefits [Hartford] ha[s] paid on [Beaumont's] behalf, and for which [Beaumont] ha[s] reimbursed us in accordance with paragraph 7 of this Agreement, with respect to all Participants exceeds the Plan Liability Limit for that Contract Year, [Hartford] agrees to reimburse to [Beaumont] the amount of such excess. However, this amount will be reduced by any monthly payments due [Beaumont] or made by [Hartford] to [Beaumont], during the Contract Year, in accordance with this Agreement."
Beaumont had argued that any benefits becoming due within the contract year should be accounted for in determining whether the APLL had been reached because section 3(a) referred to the APLL and that section talked about Beaumont's liability for benefits that become due. Conversely, Hartford had maintained that section 3(d) only provided for the consideration of "paid" claims in determining whether the APLL had been reached. The district court agreed with Hartford, concluding that section 3(d) was the applicable section and that that section unambiguously referred only to "paid" claims when calculating the APLL. But in revisiting the summary judgment ruling, the district court held that "contract year," as used in

18

On cross-appeal, Hartford maintains that the district court's ruling was in error. First, Hartford contends that section 2 of the MPP unambiguously (once the scrivener's error is taken into account) states that incurred but unpaid claims at the end of the agreement fall under section 3(g). Section 3(g) requires that any payments made by Hartford after September 30, 1989 would be reimbursed by Beaumont to the lesser of the costs plus administrative fees or the PBEL, provided Beaumont elected that to occur. Beaumont, however, did not choose that option; rather, it chose one of Hartford's competitors to pay the claims. Second, Hartford argues that the district court improperly read "paid or due" into section 3(g) when the plain language refers only to "paid claims." Thus, any payable claims should not have been counted towards the APLL, and Hartford should not have had to pay for those incurred but unpaid claims that exceeded the APLL.

Despite Beaumont's and the district court's attempts to harmonize the MPP and make it appear reasonable, we agree with Hartford's interpretation of the MPP, which better follows the agreement's plain language. The district court's initial interpretation of section 3(d) at the summary judgment stage was correct. When calculating the annual APPL, only the "paid" claims

section 3(d), encompassed more than claims paid in a calendar year and that the terms had to be defined by other provisions in the MPP. Consequently, the district court determined that a "contract year" included all transactions within that year and the consequences that may take place after the end of that year as a result of those transactions.

counted.  More importantly, section 2 explicitly states what happens to incurred but unpaid claims on September 30, 1989: they are disposed of under section 3(g), not section 3(f) and 3(g) as the district court and Beaumont contend.  Neither explains how one gets to section 3(f) given section 2's plain language (and correction of the scrivener's error).  In addition, section 3(f) focuses on Beaumont's responsibility to provide funds for paid and payable claims up to the end of the agreement.  It does not mention how the "payable" claims will be allocated between Beaumont and Hartford.  Instead, section 2 reveals that section 3(g) provides the mechanism through which those claims will be disposed.  Hence, we conclude that the district court misinterpreted the MPP and render judgment in favor of Hartford on Beaumont's breach of contract claim.

With our conclusion that Hartford did not breach the MPP, the only remaining live issue in the dispute between Beaumont and Hartford is whether Hartford violated article 21.21-2 of the Texas Insurance Code.

2.  Beaumont's Claim Under Article 21.21-2 of the Texas Insurance Code and Treble Damages

Beaumont alleges that Hartford violated article 21.21-2 of the Texas Insurance Code[17] by knowingly misrepresenting pertinent policy

---

[17] The Insurance Code provision at issue reads as follows:
Sec. 2. (a) No insurer doing business in this state under the authority, rules and regulations of this code shall engage in unfair settlement practices.
(b) Any of the following acts by an insurer shall be

20

provisions when, in response to Beaumont's 1993 request for a copy of its MPP, Hartford mailed to Beaumont a copy of a 1987 agreement (which was an updated version of the 1986 MPP) that was never consummated by the parties. Beaumont contends that the actual 1986 agreement signed by the parties, the only one ever in effect, contained materially different provisions. The most important difference was that the 1987 MPP removed the PBEL from the agreement. Moreover, Beaumont asserts that Hartford attached the signature page from the 1986 agreement to the 1987 agreement sent to Beaumont. As a result of Hartford's alleged violation of article 21.21-2, Beaumont seeks treble damages as allowed under the Texas Insurance Code. The district court, however, concluded that Hartford did not engage in a deceptive act, and treble damages were not awarded.

Hartford presses two reasons for upholding the district court's judgment: (1) Beaumont suffered no damages as a result of receiving the 1987 MPP, as required for recovery under the Texas Insurance Code; and (2) there was no evidence of knowing conduct. In its reply brief, Beaumont admits that it "incurred no additional damages by virtue of Hartford's deceptive acts." Instead, Beaumont

---

constitute unfair settlement practices:
   (1) Knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue;
Tex. Ins. Code Ann. art. 21.21-2, §§ 2(a) & (b)(1) (Vernon Supp. 2000). The earlier version of article 21.21-2 is quite similar to the current version, and for purposes of this case, the difference does not alter the outcome.

appears to argue that Hartford's breach of contract and 1993 misrepresentation of the MPP were part-and-parcel of the same damages suffered by Beaumont.

Under Texas law, however, an insured cannot recover treble damages for a mere breach of contract. *See* **State Farm Fire & Cas. Ins. Co. v. Vandiver**, 970 S.W.2d 731, 744 (Tex. App.—Waco 1998, no pet.) (citations omitted). Beaumont had the burden of establishing that it sustained actual injuries as a result of the conduct it alleges was prohibited by the Texas Insurance Code. *See* **Walker v. Federal Kemper Life Assurance Co.**, 828 S.W.2d 442, 454 (Tex. App.—San Antonio 1992, writ denied); **First Am. Title Co. of El Paso v. Prata**, 783 S.W.2d 697, 701 (Tex. App.—El Paso 1989, writ denied). As Beaumont seems to admit, there is no evidence that Hartford's alleged misrepresentation in 1993 caused any injury other than what Beaumont had already suffered in 1989 by Hartford's allegedly improper failure to pay claims.

Beaumont's reliance on **Fort Worth Mortgage v. Abercrombie**, 835 S.W.2d 262 (Tex. App.—Houston [14th Dist.] 1992, no writ), is unavailing. The Abercrombies had purchased a mortgage protection policy which would have paid their house payments for up to 300 months in the event Mr. Abercrombie became disabled. In 1986, Mr. Abercrombie became permanently disabled, but the insurance only covered one year of house payments. It turned out that the policy they originally signed had been canceled in 1979 and substituted

22

with a policy with less benefits. As the court noted, the switching of policy benefits without notice caused, at a minimum, "confusion or misunderstanding." *Id.* at 265. In contrast to the present case, the switch in *Abercrombie* caused the damages. Here, the damages Beaumont complains of occurred in 1989, when Hartford failed to pay claims under the contract, while the alleged misrepresentation did not take place until 1993.

As for Hartford's second contention, there is conflicting evidence as to whether Hartford committed a knowing deception. To knowingly misrepresent, "a person must think to himself at some point, 'Yes, I know this is false, deceptive, or unfair to him, but I'm going to do it anyway.'" *St. Paul Surplus Lines Ins. Co. v. Dal-Worth Tank Co.*, 974 S.W.2d 51, 54 (Tex. 1998) (per curiam). Moreover, knowingly "means actual awareness of the falsity, deception, or unfairness of the conduct in question." *Id.* at 53. Although "actual awareness" may be inferred by objective manifestations, it "does not mean merely a person knows what he is doing; rather, it means that a person knows that what he is doing is false, deceptive, or unfair." *Id.* at 53-54. The only evidence supportive of Beaumont's position is Hartford's sending, in 1993, the 1987 agreement, allegedly with 1986's signature form. But Hartford's own files revealed no 1986 signature page attached to the 1987 contract.

For the foregoing reasons, we affirm the district court's

judgment denying Beaumont treble damages for its claim under article 21.21-2 of the Texas Insurance Code.

### III. CONCLUSION

After a careful review of the briefs and relevant portions of the record, we find no error on the part of the district court's ruling that Pasadena take nothing for its claims against Hartford. Moreover, we conclude that the district court did not err when it denied restitution to Hartford. Accordingly, we affirm the district court's judgment with respect to Pasadena's and Hartford's claims against each other.

As for Beaumont's dispute with Hartford over the funding and administration of Beaumont's health insurance plan, we affirm the district court's ruling that Hartford did not violate article 21.21-2 of the Texas Insurance Code, but we find that the district court misinterpreted the MPP and, therefore, reverse and render judgment in favor of Hartford on Beaumont's breach of contract claim.

24