**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 01-41450

BRITTAN COMMUNICATIONS INTERNATIONAL CORPORATION,

Plaintiff-Appellant,

versus

SOUTHWESTERN BELL TELEPHONE COMPANY,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Texas

December 16, 2002

Before DeMOSS, STEWART, and DENNIS, Circuit Judges.

CARL E. STEWART, Circuit Judge:

Brittan Communications International Corporation ("Brittan") filed suit against Southwestern Bell Telephone Company ("SWBT") in Texas state court alleging, <u>inter alia</u>, violations of the Communications Act of 1933 ("the Act"), common law fraud, and violations of the Texas Deceptive Trade Practices Act ("DTPA"). SWBT removed the case to federal court and filed motions for judgment on the pleadings and summary judgment. On November 9, 2001, the district court granted, <u>inter alia</u>, SWBT's motion for judgment on the pleadings with respect to Brittan's claim under the

Communications Act and motion for summary judgment with respect to Brittan's fraud claim and its claims under the DTPA. The district court issued a final judgment and Brittan appealed. For the following reasons, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

Brittan began operating as a switchless reseller of long-distance telephone services in 1995. Brittan did not have its own telecommunications facilities, but rather leased long-distance access from two existing long-distance carriers ("Lessors"). It then resold the leased long-distance services to its customers in forty-two states.

As is common in the telecommunications industry, Brittan billed its customers through local exchange carriers ("LECs"), like SWBT. In order to do so, Brittan submitted its charges to a third-party billing aggregator with whom Brittan had a contract, namely Billing Concepts or its subsidiaries (collectively "Billing Concepts"). Billing Concepts performed billing aggregation services for multiple long-distance providers, including Brittan. Billing Concepts aggregated Brittan's charges with those of other long-distance providers and submitted them to SWBT.[1] SWBT would then place Brittan's charges on the bills of its local telephone service customers, collect the payments due, and forward the monies received to Billing Concepts. Billing Concepts would then transfer the funds to Brittan.

On November 9, 1998, SWBT notified Billing Concepts that it would no longer accept billing records from Brittan, effective the following day. Brittan allowed its customers to continue to make long-distance calls, for which Brittan had to pay its Lessors, but Brittan was unable to bill those customers through SWBT. According to SWBT, it suspended billing services for Brittan in response

---

[1] Brittan and SWBT did not have a contractual relationship. Billing Concepts, however, had a billing and collection contract with SWBT.

2

to a large number of "slamming" and "cramming" complaints by SWBT's customers.[2]  In September 1998, SWBT received approximately 2400 customer complaints associated with charges that Billing Concepts had tendered to SWBT for billing.  In late October 1998, SWBT conducted a random sampling of 100 of these 2400 customer complaints from September.  The results of the survey indicated that more complaints had been filed against Brittan than against any other long-distance provider billing through Billing Concepts.

On November 2, 1998, SWBT wrote to Billing Concepts explaining that it intended to suspend billing of charges generated by Brittan unless Billing Concepts could inform SWBT, by November 7, 1998, of any reasons why it should not do so.  Under the terms of its billing contract with Billing Concepts, SWBT was not obligated to process "[c]harges for services which, in SWBT's sole opinion, may result in nuisance calls to SWBT."  On November 6, 1998, Brittan wrote Billing Concepts placing blame for the complaints in the sample on Brittan's Lessors.  On November 9, 1998, SWBT notified Billing Concepts that SWBT would no longer accept billing records from Brittan, effective November 10, 1998, because it had not received adequate assurances from Billing Concepts that the number of complaints would be reduced in the future.  In its letter to Billing Concepts, SWBT indicated that Brittan must provide SWBT with a specific action plan designed to reduce complaints in order to regain privileges.  "These action plans must be specific, and need to address future actions, not reasons for past failures."

According to Brittan, SWBT's survey of complaints was skewed in favor of Billing Concept's largest customer, Worldcom, and against Brittan.  Brittan contends that it never engaged in cramming

---

[2] "Cramming" refers to charging a customer for services that were not ordered, authorized, or received. "Slamming" refers to switching a customer's long-distance provider without the customer's consent.

3

and that all of the so-called cramming complaints in the survey were merely calls from customers who were unfamiliar with new fees imposed on long-distance providers in 1998 by the Federal Communications Commission ("FCC"). The FCC allowed long-distance providers to pass these fees on to customers.[3] Brittan simultaneously contends that the complaints in the survey were due to errors in electronic transmission codes allegedly caused by SWBT.

On November 16, 1998, representatives of SWBT, Billing Concepts, and Brittan participated in a conference call. During this call, SWBT and Billing Concepts agreed that Billing Concepts would decide whether or not Brittan's billing would be reinstated. Brittan claims that SWBT's representative stated that billing services would promptly be restored as soon as Billing Concepts made the decision to forward Brittan's billing records to SWBT.

On or about November 24, 1998, Billing Concepts informed SWBT that Brittan should be reinstated on SWBT's billing tables. On December 15, 1998, SWBT resumed billing Brittan-generated charges for Billing Concepts. The money collected from those bills was paid to Billing Concepts in the normal course of business.

In June 2000, Brittan brought suit against SWBT in state court seeking damages stemming from the suspension of its billing and collection services. SWBT removed the case to federal court and filed motions for judgment on the pleadings and for summary judgment. On November 9, 2001, the district court granted SWBT's motions and entered final judgment. Brittan appeals.

DISCUSSION

---

[3] Brittan concedes that it, like every long-distance provider, has had problems with slamming, but claims to have taken extensive steps to address the problem.

Brittan presents the following issues on appeal: (1) whether the district court erred in granting SWBT's motion for judgment on the pleadings on Brittan's claim under Title II of the Communications Act of 1933, 47 U.S.C. § 202(a); (2) whether the district court erred in granting summary judgment for SWBT on Brittan's common law fraud claim; and (3) whether the district court erred in granting summary judgment for SWBT on Brittan's claims under the DTPA, TEX. BUS. & COM. CODE ANN. §§ 17.45(5) and 17.46(b)(5) & (7).

I.      Section 202(a) of the Communications Act

We review the grant of judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) de novo. St. Paul Fire & Marine Ins. Co. v. Convalescent Serv., Inc., 193 F.3d 340, 342 (5th Cir. 1999). In doing so, we must look only to the pleadings and accept all allegations contained therein as true. Id. Pleadings should be construed liberally, and judgment on the pleadings is appropriate only if there are no disputed issues of material fact and only questions of law remain. Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 891 (5th Cir. 1998). "[T]he central issue is whether, in the light most favorable to the plaintiff, the complaint states a valid claim for relief." Hughes v. The Tobacco Inst., Inc., 278 F.3d 417, 420 (5th Cir. 2001) (quoting St. Paul Mercury Ins. Co. v. Williamson, 224 F.3d 425, 440 n.8 (5th Cir. 2000)).

Title II of the Communications Act outlines the duties of common carriers in the provision of interstate or foreign communication services and establishes procedures for enforcement of those duties. 47 U.S.C. §§ 201-224. Brittan claims that SWBT's temporary suspension of billing and collection services violates § 202(a) of the Act. Section 202(a) states as follows:

> It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service, directly or indirectly, by any

5

means or device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage.

47 U.S.C. § 202(a) (2001).

The district court aptly looked for guidance from the FCC - the agency charged with administration of the Communications Act - in determining whether Brittan's claim fell within the scope of § 202(a). After reviewing the pertinent FCC decisions, the district court determined that "the relevant principle that can be extracted from these FCC decisions is that billing and collection services that do not utilize communications over the common carrier's wire or radio facilities are not 'communications services' regulated by Title II of the Communications Act." Thus, the district court concluded that Brittan had not alleged a cognizable § 202(a) claim. We agree that the FCC has stated a clear position on this issue. In light of the FCC's position, we agree with the district court's conclusion. See generally Verizon Communications Inc. v. FCC, 122 S. Ct. 1646, 1687 (2002) (reinstating FCC pricing and unbundling rules because they effectuated a reasonable interpretation of the Act).

To discern the FCC's position, we look to the history and purpose of the agency's decisions. In 1986, the FCC issued a decision which resulted in the detariffing of billing and collection services under Title II of the Act. In the Matter of Detariffing of Billing & Collection Services, 102 F.C.C.2d 1150 (1986). The FCC analyzed the scope of its jurisdiction under Title II and stated the following:

Two distinct questions must be asked in order to determine whether a particular activity is subject to such Title II regulation. Is the activity an interstate or foreign communication service? Is the person or entity offering the service as a common carrier? Although carrier billing and collection for a communication service that it offers individually or as a joint offering with other carriers is an incidental part of a communication service, we believe that carrier billing or collection for the offering of

6

> another unaffiliated carrier is not a communication service for purposes of Title II of the Communications Act.

Id. ¶ 31 (emphasis added). Rather, the FCC explained that billing and collection were "financial and administrative service[s]." Id. ¶ 32. Thus, according to the FCC, "billing and collection services provided by local exchange carriers are not subject to regulation under Title II of the Act." Id. ¶ 34; see also Int'l Audiotext Network, Inc. v. AT&T, 893 F. Supp. 1207, 1223-24 (S.D.N.Y. 1994) (noting that billing and collection services provided by local exchange carriers are not subject to regulation under Title II of the Act which includes 47 U.S.C. § 202(a)); In the Matter of Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for Joint Use Calling Cards, 7 F.C.C. Rcd. 3528, 3533 n.50 (1992) (affirming that "[b]illing and collection, of course, remains outside the scope of Title II because it is not a common carrier service").

The FCC conducted its analysis in response to the changed landscape of the telecommunications industry due to the breakup of the Bell System. As the D.C. Circuit explained:

> In 1986, the FCC reexamined both its post-breakup jurisdiction to regulate the LECs' provision of billing and collection services and the desirability of continued regulation. The FCC acknowledged that it could no longer exercise jurisdiction over billing and collection services on the basis of Title II of the Act because it was now apparent - after the breakup - that these services were not "common carrier services." Instead, it rested its jurisdiction in this area on its authority under Title I to regulate (or deregulate) services "incidental" to the transmission of communication by wire. Moreover, seeing that the LECs were facing competition in the billing and collection area, and therefore that a market for these services was developing, it decided to eliminate all rate regulation of the billing and collection services provided by the LECs to interexchange carriers.

Pub. Serv. Comm. of Md. v. FCC, 909 F.2d 1510, 1512 (D.C. Cir. 1990) (citations omitted).

Brittan contends that the FCC has retreated in recent years from its earlier position that billing and collection services are financial and administrative services, outside the scope of Title II.

7

Although it may be true that the FCC has moved away from the position that billing and collection services are financial and administrative services, this does not persuade us to conclude that the billing and collection services at issue in this case fall within Title II. Brittan has cited no FCC decision in which the FCC has altered its view that billing and collection services provided by LECs to unaffiliated long-distance providers fall outside the scope of Title II. See In the Matter of Federal-State Joint Board on Universal Service, 13 F.C.C. Rcd. 24,744, ¶ 70 & n.87 (1998) (finding that billing and collection services are subject to Title II, but only as to a carrier's own billing and collections). Likewise, Brittan has cited to no case holding that billing and collection services fall within the scope of Title II. Alternatively, Brittan contends that the FCC's position is arbitrary, thus it should not be afforded deference by this Court. We disagree. Accordingly, because the type of claim asserted by Brittan does not fall within the scope of Title II, we affirm the district court's grant of SWBT's motion for judgment on the pleadings with regard to Brittan's § 202(a) claim.

## II.    Fraud Claim

We review the grant of summary judgment de novo. Mowbray v. Cameron County, Tex., 274 F.3d 269, 278 (5th Cir. 2001). Summary judgment is appropriate only when the record indicates "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56. "Questions of fact are reviewed in the light most favorable to the nonmovant and questions of law are reviewed de novo." Mowbray, 274 F.3d at 278-79.

In order to prove fraud under Texas law, Brittan must show that: (1) SWBT made a material representation; (2) that was false; (3) SWBT knew that it was false or made it recklessly without knowledge of its truth; (4) SWBT intended to induce Brittan to act upon the representation; (5) Brittan actually and justifiably relied upon the representation; and (6) Brittan was injured as a result.

Ernst & Young L.L.P. v. Pac. Mut. Life Ins. Co., 51 S.W.3d 573, 577 (Tex. 2001). The dispositive element here is whether Brittan justifiably relied upon the representation. A "[d]etermination of justifiable reliance turns on 'whether - given the fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud - it is extremely unlikely that there is actual reliance on the plaintiff's part.' " Quest Exploration & Dev. Co. v. Transco Energy Co., 24 F.3d 738, 742 (5th Cir. 1994) (quoting Haralson v. E.F. Hutton Group, Inc., 919 F.2d 1014, 1026 (5th Cir. 1990)).

On appeal, Brittan argues that it was harmed by SWBT's misrepresentation regarding the time frame for resuming billing services for Brittan. According to Brittan, during the November 1998 conference call, SWBT assured Brittan that it would "resume billing for Brittan promptly as soon as Billing Concepts was willing to forward the billing." Brittan contends that it relied on these representations in making business decisions, most importantly allowing its customers to continue to use long distance services at its expense.

The district court concluded that Brittan's fraud theory was fatally flawed because Brittan failed to claim that it justifiably relied on the alleged misrepresentation by SWBT, an element of the claim. The parties agree that at the end of the conference call, the decision of when, and if, Billing Concepts would resume submitting Brittan-generated charges to SWBT was left entirely up to Billing Concepts, not SWBT. As the district court summarized the situation, "[b]ecause Brittan was aware that Billing Concepts may not have ever agreed to resume its submission of Brittan's charges to SWBT, Brittan cannot prove that it justifiably acted upon the alleged misstatement by SWBT." (emphasis in original). We agree. Examining the "facts and circumstances at or before the time of the alleged fraud," it is clear that neither Brittan nor SWBT knew if Brittan's billing services were

9

going to be restored by Billing Concepts. Any reliance, even if actual, was not justifiable. Any alleged misrepresentation by SWBT regarding the length of time it would take to restore billing services was essentially meaningless given that the decision of when, and if, to resume rested with Billing Concepts.

For the foregoing reasons, we affirm the district court's grant of summary judgment for SWBT on Brittan's fraud claim.

III.    DTPA Claims

Brittan claims that SWBT's alleged misstatement during the November 1998 conference call forms the basis for its claims that SWBT committed "false, misleading, or deceptive acts" in violation of § 17.46(b)(5) & (7), and acted unconscionably in violation of § 17.45(5).[4] The district court granted SWBT summary judgment on Brittan's DTPA claims. As we explained above, we review the district court's grant of summary judgment de novo.

To maintain a cause of action under the Texas DTPA, Brittan must establish that (1) it is a consumer under the DTPA with respect to its claim against SWBT; (2) SWBT committed a false, misleading, or deceptive act under § 17.46(b) of the DTPA, breached an express or implied warranty,

_____

[4] Under § 17.46(b)(5), "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which he does not" is a false, misleading, or deceptive act. Under § 17.46(b)(7), "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" is a false, misleading, or deceptive act. Finally, an "unconscionable action or course of action" under the DTPA "means an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." TEX. BUS. & COM. CODE ANN. § 17.45(5) (Vernon 2002). "To prove an unconscionable action or course of action, a plaintiff must show that the defendant took advantage of his lack of knowledge and that the resulting unfairness was glaringly noticeable, flagrant, complete and unmitigated." Bradford v. Vento, 48 S.W.3d 749, 760 (Tex. 2001) (internal quotations omitted).

10

or engaged in an unconscionable action or course of action; and (3) these acts were the producing cause of Brittan's actual damages. Brown v. Bank of Galveston, N.A., 963 S.W.2d 511, 513 (Tex. 1998). The DTPA defines "consumer" as "an individual, partnership, [or] corporation . . . who seeks or acquires by purchase or lease, any goods or services." TEX. BUS. & COM. CODE ANN. § 17.45(4) (Vernon 2002). To qualify as a consumer, and thus to have standing to sue under the DTPA, Brittan must satisfy two requirements: (1) it must have sought or acquired goods or services by purchase or lease; and (2) the goods or services purchased or leased must form the basis of the complaint. Cameron v. Terrell & Garrett, Inc., 618 S.W.2d 535, 539 (Tex. 1981). "If either requirement is lacking, the person aggrieved by a deceptive act or practice must look to the common law or some other statutory provision for redress." Id. For liability to be imposed under the DTPA, the defendant's deceptive conduct must have occurred "in connection with" a consumer transaction. Amstadt v. U.S. Brass Corp., 919 S.W.2d 644, 649 (Tex. 1996).

SWBT argues that Brittan is not a "consumer" within the meaning of the DTPA because Brittan bases its DTPA claims on its contention that SWBT wrongfully suspended its billing and collection services and that SWBT did not promptly reinstate these services. Brittan does not claim that it encountered problems with the quality of the billing and collection services themselves.

In American Distributing Corp. v. ACS Communications, Inc., this Court held that a former exclusive distributor's claim against a supplier who unilaterally terminated the distribution agreement did not state a claim under the Texas DTPA because, although the distributor purchased goods from the supplier, the claim was based on the suspension of the distributorship, rather than any fault in the goods. 990 F.2d 223, 227 (5th Cir. 1993); see also Footloose, Inc. v. Stride Rite Children's Group, Inc., 923 F. Supp. 114, 116 (N.D. Tex. 1995) (holding that a dealer in shoes did not state a cause of

11

action against a manufacturer for violation of the DTPA, as the dealer alleged only that the manufacturer wrongfully terminated the sales relationship, and had not made any claims that the shoes were defective). We conclude that this case poses a similar situation. In light of our previous decision in American Distributing Corp., we hold that Brittan does not qualify as a "consumer" under the DTPA, and thus does not have standing. Thus, we affirm the district court's grant of summary judgment for SWBT on each of Brittan's claims under the DTPA.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of judgment on the pleadings for SWBT on its claim under the Communications Act and its grant of summary judgment for SWBT on Brittan's common law fraud claim and its claims under the Texas DTPA.

AFFIRM.

DENNIS, Circuit Judge, concurring in part and dissenting in part:

While I join in the majority's opinion on the Texas Deceptive Trade Practices Act claim, I respectfully dissent on the Communications Act and common law fraud claims for the following reasons.

## I.  Section 202(a) Claim

Because the FCC has reversed its position on whether it may regulate billing and collection services under Title II of the Communications Act, Brittan should be allowed to maintain an action based on Section 202(a) of the Communications Act.[5]  Therefore, the district court should not have granted judgment on the pleadings.

In determining whether Brittan may maintain an action under Section 202(a) of the Communications Act, we must examine whether the FCC considers billing and collection services to be common carrier communication services, which are subject to regulation under Title II and Section 202(a).   However, in conducting this inquiry, the question is not whether the FCC is actually regulating billing and collection services under Title II, but rather whether the FCC *can* regulate billing and collection services under this Title.

In 1986, the FCC held that billing and collection services were not subject to Title II regulation because: (1) they were financial and administrative services, not communication services, and (2) they were not common carrier services.  *In re Detariffing of Billing and Collection Services*, 102 F.C.C.2d 1150 (1986).  In 1992, the FCC changed its position and declared that billing and

---

5    Title II regulates common carrier communication services in general.  More specifically, Section 202(a) is a provision of Title II and prohibits discrimination involving common carrier communication services.

-13-

collection services were communication services, but not common carrier services. *In re Policies and Rules Concerning Local Exchange Carrier Validation and Billing Information for Joint Use Calling Cards*, 7 F.C.C.Rcd. 3528, 3533 n.50 (1992). Therefore, these services were still not subject to Title II regulation. *Id*. However, in 1998, the FCC changed its position again and held that billing and collection services are common carrier services and subject to Title II regulation. *In the Matter of Federal-State Joint Board on Universal Service*, 13 F.C.C.Rcd. 24,774, ¶ 70 (1998)("We believe that a carrier's billing and collection services are subject to regulation as common carrier services under Title II.").

Although the FCC has only chosen to regulate billing and collection services involving local exchange carriers and its local telephone customers, this does not mean that Title II and Section 202(a) do not encompass all billing and collection services. In 1999, the FCC explained that whether particular billing and collection services are actually regulated or not depends on whether regulation is needed to protect competition. *In re Calling Party Pays Services Offering in the Commercial Mobile Radio Services*, 14 F.C.C.Rcd. 10,861, ¶ 59 (1999)("In considering the regulatory treatment of billing and collection services, we observe that we have generally declined to regulate the provision of billing and collection services unless regulation is needed to protect competition."). Consequently, although the FCC currently declines to regulate certain aspects of billing and collection services under Title II, the FCC still has the capacity to regulate these services, including billing and collection services involving long-distance providers such as Brittan.

Because the FCC considers billing and collection services to be covered by Title II and Section 202(a), Brittan should be allowed to maintain its Communications Act claim against SWBT, and the district court's judgment on the pleadings should be REVERSED.

-14-

## II.  Common Law Fraud Claim

I also disagree that the district court properly granted summary judgment on the common law fraud claim was proper because Brittan could not have justifiably relied on SWBT's promise to promptly restore service as a matter of law.  Brittan could have reasonably believed that (1) Billing Concepts would allow billing and collection services to resume and (2) after that approval came, SWBT would restore service within a "day or two."  Therefore, Brittan could have justifiably relied on SWBT's promise to restore service, believing that SWBT would restore service within two days after Billing Concepts ordered service to resume, not the three weeks it actually took.

It is true that Billing Concepts, not SWBT, controlled whether billing and collection services would resume.  However, the relationship between Brittan and Billing Concepts, as well as Billing Concepts' financial incentive in allowing SWBT to resume service, could allow Brittan to reasonably believe that Billing Concepts' approval was forthcoming.  And in fact, on November 24, within eight days of SWBT's promise to restore service, Billing Concepts did order SWBT to reinstate billing and collection services to Brittan.

Brittan could have believed that SWBT would restore service within a "day or two" after Billing Concepts' permitted service to restart.  Jim Edwards, CEO of Brittan, testified in his deposition that at the teleconference on November 16, 1998, Dick Oxler, SWBT's Director of Billing and Collection, stated that he could resume billing and collection services within "the next day or two."  Even if Brittan could not have reasonably believed that service would be restored by November 17 or 18, it could have justifiably relied on that statement to believe that service would be restored on November 25 or 26, in "the next day or two" after Billing Concepts ordered SWBT to restart service.  Instead, SWBT did not restore service until December 15.

Because Brittan could have justifiably relied on SWBT's promise to restore service within a "day or two" after Billing Concepts ordered service to resume, summary judgment should not have been granted. Therefore, the district court's decision to grant summary judgment on the common law fraud claim should be REVERSED.